IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TONIA LITTLE )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>DISTRICT OF COLUMBIA WATER AND )<br>SEWER AUTHORITY )<br>)<br>Defendant. )<br>) | Civil Action No. 1:09-cv-02140<br>Judge Richard J. Leon |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff, Tonia Little ("Plaintiff"), by her undersigned counsel, Melehy & Associates, LLC, hereby amends her existing complaint against Defendant, District of Columbia Water and Sewer Authority ("Defendant"). In support of the First Amended Complaint, Plaintiff alleges as follows:

## JURISDICTION

1. Plaintiff initially brought suit against Defendant to recover back pay, front pay, compensatory damages, punitive damages, reasonable attorneys fees and litigation costs and equitable relief, including reinstatement with benefits, for violations of the Rehabilitation Act of 1973, *as amended*, 29 U.S.C. §§791, *et seq.* and the District of Columbia Human Rights Act of 1977, *as amended*, DC Code §§ 2-1401, *et seq.*

1

2. In this First Amended Complaint, Plaintiff brings suit against Defendant for violation of the Americans With Disabilities Act - 42 U.S.C. §§12111 *et seq.*, and 42 U.S.C. §12203.

3. The jurisdiction of this Court is based upon 28 U.S.C. §1331 relating to "all civil actions arising under the Constitution, laws, or treaties of the United States" and 28 U.S.C. §1332 relating to diversity of citizenship of the parties when the amount in controversy exceeds $75,000.

4. The jurisdiction of this Court over the claim under the District of Columbia Human Rights Act is based on this Court's supplemental jurisdiction conferred by 28 U.S.C. § 1367(a).

## PARTIES

5. At all times relevant to this case, Plaintiff was an individual and a resident of the State of Maryland. Plaintiff continues to reside in the State of Maryland.

6. At all times relevant to this case, Defendant was a corporate body that constitutes an independent authority of the District of Columbia Government and is organized under D.C. Code §34-2202.02.

7. Defendant receives federal financial assistance in the form of funding for its various projects including, but not limited to, projects associated with the District's obligation to reduce combined sewer overflows that pollute local waterways.

8. At all times relevant to this case, Plaintiff was an employee of the Defendant and worked at the Defendant's office in the District of Columbia.

**VENUE**

9. Venue is proper pursuant to 28 U.S.C. § 1391 because Defendant has its corporate residence in the District of Columbia, is subject to personal jurisdiction in the District of Columbia and a substantial portion if not all of the events giving rise to this litigation occurred in the District of Columbia.

**FACTS**

10. Plaintiff began working for the Defendant on December 17, 2007. She was terminated effective October 13, 2009. Plaintiff was employed by Defendant as a Contract Support Manager and her annual compensation was approximately $120,000.00. Her job duties included but were not limited to: (1) developing, implementing, administering, modifying, evaluating, interpreting and maintaining regulations, policies, and procedures governing the procurement aspects of Defendant's operations; (2) managing business development as it relates to Vendor relations and all elements of Minority Business Enterprise (MBE) programs, Woman-Owned Business Enterprise (WBE) programs and Local, Small and Disadvantaged Business Enterprise (LSDBE) programs; (3) attending supplier diversity outreach events and monitoring and reporting on contractual spending to ensure that the equitable opportunities and goals were achieved; and (4), providing for supervision, assignment and development of personnel. Plaintiff was able to perform all of the essential functions of this position from Plaintiff's home.

11. In 1995, Plaintiff was diagnosed with sarcoidosis which caused pulmonary hypertension.

12. In 2007, as part of Plaintiff's continuing treatment of her condition, she started oxygen therapy to improve her breathing capacity. She used the oxygen at home and portable oxygen tanks at work when needed. Without using the oxygen tanks, she would become short of breath and experience difficulty breathing with very mild exertion. In 2007, her lung capacity and her ability to breath were substantially limited.

13. In the Summer of 2008, Plaintiff's physicians determined that she would likely need a double lung transplant because her disease had severely damaged both of her lungs and the damage worsened with each passing day. Beginning in approximately the summer of 2008, Plaintiff brought portable oxygen tanks to work for use during the work day as needed. Plaintiff's supervisors were aware of her use of portable oxygen tanks at work.

14. Plaintiff's disease reached a critical stage in late 2008 and early 2009 as her lungs continued to deteriorate and her lung capacity continued to decrease. Breathing became more difficult, she became more tired, she experienced additional loss of energy, loss of weight and fatigue and she became easily overexerted. Because breathing was more difficult, she required oxygen more frequently and for longer periods of time.

15. In January 2009, the Plaintiff's disease progressed to the point where she had to use oxygen almost continuously throughout the work day. For example, after

making the 5-minute walk back and forth to the restroom at work, she needed to use oxygen immediately upon her return.

16. On February 13, 2009, Plaintiff was hospitalized for bronchiectasis and pulmonary emboli. As a result of this hospitalization and her condition at the time, a double lung transplant became medically necessary. Without the double lung transplant, Plaintiff had a high probability of dying from the disease.

17. As a result of the Plaintiff's bronchiectasis and pulmonary emboli, she was medically unable to work and on medical leave from February 13, 2009 through April 20, 2009. During her medical leave, she provided her supervisor, John Christoduolakis, with appropriate medical documentation to support the leave and medical release to return to work.

18. When Plaintiff returned to work on April 20, 2009, she remained substantially limited in the major life activity of breathing and substantially limited in other activities, including walking, exercising, or any other activity that required even mild physical exertion. At this time, even though the Plaintiff was sleeping with continuous oxygen, she sometimes woke up coughing because of her deteriorating lung capacity. At this time, if she engaged in any physical activities, it became difficult for her to breathe and she would start coughing. If she did not stop and regain control of her breathing by resting and using oxygen, she would feel light headed and risked fainting. She continued to experience severe loss of energy and loss of appetite and weight as a result of her lung condition.

19. Upon the Plaintiff's return to work on Monday, April 20, 2009, her deteriorating condition required her to use oxygen at work with greater frequency than previously. When she returned to work on April 20, 2009, she brought several large tanks of compressed oxygen with her to work. She brought these tanks to work each day.

20. On April 20, 2009, the same day, she informed her supervisor, John Christoduolakis, that due to the advanced stage of her disease, she would need a double lung transplant and she needed oxygen 24 hours per day. During this conversation with Christoduolakis, Plaintiff requested a reasonable accommodation – *i.e.* that she be permitted to work from home for 2-3 days per week, just as Defendant permitted other employees to do. Plaintiff informed Christoduolakis that she needed the accommodation so that she could minimize the physical exertion required to transport several oxygen tanks to and from work 5 days per week, which exacerbated her disability. Christoduolakis replied that the Human Resources Department would need to approve the request for reasonable accommodation.

21. On April 20, 2009, Katrina Wiggins, who was employed by the Human Resources Department, acknowledged in writing that the Plaintiff made a request for reasonable accommodation – *i.e.* to work at home. The Defendant informed the Plaintiff that her request would be considered.

22. On Thursday, April 24, 2009, Katrina Wiggins and Dianna Kinney came to Plaintiff's office to meet with her. Wiggins and Kinney informed Plaintiff that she was unable to work and sent her home on indefinite leave. This forced Plaintiff to use the

remainder of her leave and then, when her leave was exhausted, to collect 40% of her salary pursuant to a short disability policy that Plaintiff had purchased. Wiggins informed Plaintiff that her request for reasonable accommodation would be referred to the Defendant's ADA Panel but that Plaintiff's request to work at home would not be granted at that time.

23. Plaintiff complied with all of the Defendant's requests for medical documentation, including the signing of a medical release form on April 23, 2009, so that the Defendant could obtain all of her medical records.

23. On June 12, 2009 – almost two months after Plaintiff made the request for reasonable accommodation -- Plaintiff was called into a meeting with the Defendant's ADA Panel to discuss her request for reasonable accommodation. Present at the meeting were Wiggins, Christoduolakis, Avis Russell and Dianna Kinney. The ADA Panel members and the Plaintiff discussed the use of a stand-alone oxygen concentrator at work, which is a machine that is installed in a fixed location, emits a continuous flow of oxygen and does not require oxygen tanks. Having the oxygen concentrator provided at work prevented the Plaintiff from having to transport the heavy oxygen tanks to work and would have enabled the Plaintiff to work at the office location full-time.

24. In a letter dated June 30, 2009, Defendant acknowledged that the Plaintiff was disabled and agreed to install an oxygen concentrator in the Plaintiff's office as an accommodation of her disability. Defendant did so in lieu of allowing Plaintiff to work at

7

home. The letter stated that the Defendant would inform Plaintiff when the machine was installed and when she could return to work.

25. In July 2009, Christoduolakis left Defendant's employ and was no longer Plaintiff's supervisor. Teresa Scott, the Acting Director of Procurement, immediately replaced Chistoduolakis and became Plaintiff's first level supervisor.

26. On or about Thursday, July 9, 2009 – after Plaintiff had been on forced leave for approximately 76 days and almost three months -- Defendant contacted the Plaintiff and informed her that the oxygen concentrator was installed, ready for use in her office and that she could return to work. Pursuant to the Defendant's instructions, Plaintiff returned to work on Monday, July 13, 2009, nearly three months after making her request for reasonable accommodation.

27. As a result of the Defendant's inordinate delay in considering the Plaintiff's request for reasonable accommodation and its failure to grant any interim accommodation, Plaintiff was forced to exhaust her accrued leave and then take short-term disability at 40% of her pay, resulting lost income and a depletion of her leave balance.

28. On the evening of July 16, 2009, the hospital called the Plaintiff and informed her that two lungs were available for transplant. Plaintiff went to the hospital that day and received the transplant the next day early in the morning. After the operation, Plaintiff needed to recover and needed rehabilitation. The recovery period was expected to last several months. Following the surgery, Plaintiff was placed on a number

of medications, including but not limited to, anti-viral medication, cholesterol-reducing medication, steroids, insulin injections to combat steroid-induced diabetes and anti-rejection medication which prevented her body from rejecting the newly transplanted lungs. Plaintiff will be required to take the anti-rejection medication for the rest of her life.

29. Without the above-mentioned medications, Plaintiff is at risk of serious debilitating illness, incapacitation or death. If Plaintiff stopped taking the anti-rejection medication, she would die. Additionally, the anti-rejection medication suppresses the Plaintiff's immune response and therefore, has the effect of substantially weakening Plaintiff's immune system, placing her at substantially greater risk of contracting infections or diseases.

30. Plaintiff kept her new supervisor, Teresa Scott, fully apprised of Plaintiff's progress and medical condition following the surgery.

31. On or around October 6, 2009, Plaintiff spoke with her doctor who told her that she could return to work, but that due to her continued impaired condition, she should only return part time for 2 weeks, then full time after that.

32. Plaintiff immediately informed her supervisor Teresa Scott of this request for reasonable accommodation.

33. On or around October 7, 2009 Plaintiff's physicians faxed a letter dated October 7, 2009 to Katrina Wiggins, indicating that Plaintiff was able to return to work on Monday, October 12, 2009. The letter stated that for the first two weeks following her

9

return, Plaintiff should work no more than 25 hours per week and that she could begin working full time after that.

34. The Defendant failed to engage in the interactive process and summarily terminated Plaintiff's employment because of her disability.  In a letter dated October 8, 2009, Wiggins acknowledged receipt of Plaintiff's doctor's letter documenting her medical condition and requesting reasonable accommodation – a part time, 25-hour per week schedule for a two week period.  In the letter, Wiggins informed Plaintiff that if she could not return full-time (40 hours per week) by October 13, 2009, she would be terminated because the position required a full-time worker.  Due to the Plaintiff's disability, she was not able to return full-time on October 13, 2009 – only part time for the first two weeks.  As a result, Wiggins wrote to Plaintiff explaining that because allowing her to work part time for the first two weeks after her return would pose an undue hardship on Defendant's operations, Plaintiff's employment was terminated effective October 13, 2009.

35. On November 2, 2009, Plaintiff filed an administrative complaint with the Equal Opportunity Employment Commission, Washington Field Office, alleging that Defendant discriminated against her based on her disability under the Americans With Disabilities Act -- the same claims that are being made in this case.

36. On May 20, 2010, the Department of Justice issued Plaintiff a Notice of Right to Sue Within 90 Days.

## COUNT I
### (The Rehabilitation Act - 29 U.S.C. §§791, *et seq.*)

37. Paragraphs 1-36 of this complaint are hereby incorporated by reference.

38. At all relevant times, Defendant was Plaintiff's employer.

39. At all relevant times, Plaintiff was an employee of the Defendant.

40. At all relevant times, Defendant was a recipient of federal financial assistance within the meaning of 29 U.S.C. § 794(b).

41. At all times relevant to this Complaint, Plaintiff was disabled within the meaning of the 29 U.S.C. §705(9)(B)(which incorporates by reference the standards set forth in the ADA, 42 U.S.C. § 12102) because Plaintiff had a physical impairment that substantially limited one or more of her major life activities, a record of such impairment or was regarded as having such an impairment.

42. At all times relevant to the Complaint, Defendant knew of the Plaintiff's disability and her record of disability and it regarded her as having a disability.

43. At all times relevant to this Complaint, the Plaintiff could perform the essential functions of her position with the Defendant with reasonable accommodations.

44. At all times relevant to the Complaint, Plaintiff was a qualified person with a disability within the meaning of 29 U.S.C. §§ 705(9) and 705(20).

45. Plaintiff engaged in statutorily protected activity when she exercised her rights under of 29 U.S.C. § 794(d), by, *inter alia*, requesting reasonable accommodation,

receiving accommodation, using oxygen at work, engaging in a dialogue with the Agency about her requested accommodations and taking leave as an accommodation.

46. Defendant retaliated against the Plaintiff for engaging in statutorily protected activity, discriminated against her based on disability and failed to reasonably accommodate her (in violation of 29 U.S.C. §§ 794 (a) and (d)) from April 24, 2009 to July 13, 2009, when the Defendant refused the permit the Plaintiff to work, forced her to exhaust accrued and earned leave and then forced her to go on disability status where she collected 40% of her pay.  Defendant did so despite the fact that at all times from April 24, 2009 to July 13, 2009, Plaintiff remained ready, willing and able to perform the essential functions of her position with reasonable accommodation.

47. The Defendant retaliated against Plaintiff for engaging in statutorily protected activity, discriminated against her based on disability and failed to reasonably accommodate her (in violation of 29 U.S.C. §§ 794 (a) and (d)), when the Defendant unreasonably delayed granting Plaintiff's request for reasonable accommodation for almost three months and failed to provide any immediate interim reasonable accommodation during the period of the ADA Panel's decision making process.  This forced Plaintiff to exhaust her leave and accept a reduced wage – 40% of her salary for the period of time after her leave was exhausted.

48. Defendant retaliated against Plaintiff for engaging in statutorily protected activity, discriminated against her based on disability and failed to reasonably accommodate her (in violation of 29 U.S.C. §§ 794 (a) and (d)), when on October 8,

2009, the Defendant denied the Plaintiff's request to work 25 hours per week work for the first two weeks following her proposed return to work on October 13, 2009.

49. Defendant retaliated against Plaintiff for engaging in statutorily protected activity, discriminated against her based on disability and failed to reasonably accommodate her (in violation of 29 U.S.C. §§ 794 (a) and (d)), when on October 13, 2009, the Defendant terminated the Plaintiff's employment.

50. As a result of the Defendant's actions, Plaintiff suffered damages.

WHEREFORE, Plaintiff prays that this Court enter judgment against Defendant for the following: (a) such compensatory damages as a jury might award; (b) reinstatement with full back pay and benefits and/or front pay; (c) restoration of lost leave or compensation for use of leave; (d) attorneys' fees and litigation costs; (e) pre-judgment interest; and (f) post-judgment interest.

## COUNT II
### (D.C. Human Rights Act - D.C. Code §§ 2-1401, *et seq*.)

51. Paragraphs 1-50 of this complaint are hereby incorporated by reference.

52. At all times relevant to the Complaint, the Defendant was an employer.

53. At all times relevant to the Complaint, the Plaintiff was the Defendant's employee.

54. At all times relevant to this Complaint, Plaintiff was disabled within the meaning of the D.C. Code §2-1401.02(5A) because she had a physical impairment that

substantially limited one or more of her major life activities, she was regarded as having such an impairment and she had a record of having such an impairment.

55. Defendant knew of the Plaintiff's disability and her record of a disability and it regarded the Plaintiff as having a disability.

56. At all times relevant to this Complaint, Plaintiff was able to perform the essential functions of her position with the Defendant with reasonable accommodation.

57. Plaintiff engaged in statutorily protected activity when she exercised her rights under § 2-1402.11 by, *inter alia*, requesting reasonable accommodation, receiving accommodation, using oxygen at work, engaging in a dialogue with the Agency about her requested accommodations and taking leave as an accommodation.

58. Defendant retaliated against Plaintiff for engaging in statutorily protected activity, discriminated against her based on disability and failed to reasonably accommodate her (in violation of §§ 2-1402.11 and 2-1402.61) from April 24, 2009 to July 13, 2009, when the Defendant refused to permit the Plaintiff to work when she was able to perform the essential functions of her job with reasonable accommodation and failed to grant her an interim accommodation or timely address her request for reasonable accommodation. This forced Plaintiff to exhaust her leave and accept a reduced wage – 40% of her salary for the period of time after her leave was exhausted.

59. Defendant retaliated against Plaintiff for engaging in statutorily protected activity, failed to reasonably accommodate her and discriminated against her based on disability (in violation of §§ 2-1402.11 and 2-1402.61), when Defendant unreasonably

delayed granting the Plaintiff's request for reasonable accommodation for almost three months and failed to provide any immediate interim reasonable accommodation while the ADA Panel considered her request.

60.     Defendant retaliated against Plaintiff for engaging in statutorily protected activity, failed to reasonably accommodate her and discriminated against her based on disability (in violation of §§ 2-1402.11 and 2-1402.61) when on October 8, 2009, Defendant denied the Plaintiff's reasonable accommodation request to work 25 hours per week for the first two weeks following her return to work.

61.     Defendant retaliated against Plaintiff for engaging in statutorily protected activity, failed to reasonably accommodate her and discriminated against her based on disability (in violation of §§ 2-1402.11 and 2-1402.61) when on October 13, 2009, the Defendant terminated the Plaintiff's employment.

62.     As a result of the Defendant's actions, Plaintiff suffered damages.

WHEREFORE, Plaintiff prays that this Court enter judgment against Defendant for the following: (a) such compensatory damages as a jury might award; (b) such punitive damages as a jury might award; (c) restoration of lost leave or compensation for use of leave; (d) attorneys' fees and litigation costs; (e) pre-judgment interest; and (f) post-judgment interest.

### COUNT III
**(Americans With Disabilities Act - 42 U.S.C. §§12111, *et seq*., and 42 U.S.C. §12203)**

63.     Paragraphs 1-62 of this complaint are hereby incorporated by reference.

64. At all relevant times, Defendant was Plaintiff's employer.

65. At all relevant times, Plaintiff was an employee of the Defendant.

66. At all relevant times, Defendant was a covered entity within the meaning of 42 U.S.C. § 12111(2).

67. At all relevant times, Plaintiff was a qualified individual within the meaning of 42 U.S.C. § 12111 (8).

68. At all times relevant to this Complaint, Plaintiff was disabled within the meaning of 42 U.S.C. § 12102 because Plaintiff had a physical impairment that substantially limited one or more of her major life activities, a record of such impairment or was regarded as having such an impairment.

69. At all times relevant to the Complaint, Defendant knew of the Plaintiff's disability and her record of disability and it regarded her as having a disability.

70. At all times relevant to this Complaint, the Plaintiff could perform the essential functions of her position with the Defendant with reasonable accommodations.

71. Defendant retaliated against the Plaintiff for engaging in statutorily protected activity, discriminated against her based on disability and failed to reasonably accommodate her (42 U.S.C. §§12111 *et seq*., and 42 U.S.C. §12203) from April 24, 2009 to July 13, 2009, when the Defendant refused the permit the Plaintiff to work, forced her to exhaust accrued and earned leave and then forced her to go on disability status where she collected 40% of her pay. Defendant did so despite the fact that at all

times from April 24, 2009 to July 13, 2009, Plaintiff remained ready, willing and able to perform the essential functions of her position with reasonable accommodation.

72. The Defendant retaliated against Plaintiff for engaging in statutorily protected activity, discriminated against her based on disability and failed to reasonably accommodate her (42 U.S.C. §§12111 *et seq*., and 42 U.S.C. §12203), when the Defendant unreasonably delayed granting Plaintiff's request for reasonable accommodation for almost three months and failed to provide any immediate interim reasonable accommodation during the period of the ADA Panel's decision making process. This forced Plaintiff to exhaust her leave and accept a reduced wage – 40% of her salary for the period of time after her leave was exhausted.

73. Defendant retaliated against Plaintiff for engaging in statutorily protected activity, discriminated against her based on disability and failed to reasonably accommodate her (42 U.S.C. §§12111 *et seq*., and 42 U.S.C. §12203), when on October 8, 2009, the Defendant denied the Plaintiff's request to work 25 hours per week work for the first two weeks following her proposed return to work on October 13, 2009.

74. Defendant retaliated against Plaintiff for engaging in statutorily protected activity, discriminated against her based on disability and failed to reasonably accommodate her (42 U.S.C. §§12111 *et seq*., and 42 U.S.C. §12203), when on October 13, 2009, the Defendant terminated the Plaintiff's employment.

75. As a result of the Defendant's actions, Plaintiff suffered damages.

WHEREFORE, Plaintiff prays that this Court enter judgment against Defendant for the following: (a) such compensatory damages as a jury might award; (b) such punitive damages as a jury might award; (c) restoration of lost leave or compensation for use of leave; (d) attorneys' fees and litigation costs; (e) pre-judgment interest; and (f) post-judgment interest.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable to a jury as a matter of right.

Respectfully Submitted,

MELEHY & ASSOCIATES LLC

\_\_\_\_\_/s/_____
Omar Vincent Melehy
D.C. Bar No. 415849
8403 Colesville Road, Suite 610
Silver Spring, MD 20910
Tel    301-587-6364
Fax    301-587-6308
Email:  ovmelehy@melehylaw.com
*Attorney for Plaintiff*